1        UNITED STATES BANKRUPTCY COURT

2     WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3

4

5     _____

6     IN RE:                    )

7     GARY R. MCLEAN,           )

8            Debtor.            )    10-14407

9                              )

10    _____

11       EXAMINATION OF KEVIN HANCHETT

12              PURSUANT TO

13        BANKRUPTCY RULE 2004

14    _____

15

16

17              1:00 P.M.

18         NOVEMBER 24, 2015

19     700 STEWART STREET, SUITE 5103

20        SEATTLE, WASHINGTON

21

22

23

24

25   REPORTED BY:   SHARI L. WHEELER, CCR NO. 2396



YOM
YAMAGUCHI
OBRIEN
MANCIO
COURT REPORTING & VIDEO

206.622.6875 | 800.831.6973
production@yomreporting.com
www.yomreporting.com

```
 1              A P P E A R A N C E S

 2

 3    FOR THE DEBTOR:

 4        MICHAEL E. GOSSLER
          Montgomery Purdue Blankinship & Austin, PLLC
 5        701 Fifth Avenue, Suite 5500
          Seattle, Washington 98104
 6        206.682.7090
          mgossler@mpba.com

 7

 8    FOR LASHER HOLZAPFEL SPERRY & EBBERSON, PLLC, and
      KEVIN HANCHETT:
 9
          JOEL E. WRIGHT
10        Lee Smart, P.S.
          701 Pike Street, Suite 1800
11        Seattle, Washington 98101
          206.624.7990
12        jw@leesmart.com

13

      FOR THE UNITED STATES TRUSTEE:
14
          MARTIN L. SMITH
15        KATHRYN E. PERKINS
          Office of the United States Trustee
16        700 Stewart Street, Suite 5103
          Seattle, Washington 98101
17        206.553.2000
          martin.l.smith@usdoj.gov
18        kathryn.e.perkins@usdoj.gov

19

      FOR KATHLEEN MCLEAN:
20
          ALAN J. WENOKUR
21        Law Offices of Alan J. Wenokur
          600 Stewart Street, Suite 1300
22        Seattle, Washington 98101
          206.682.6224
23        ajw@seanet.com

24

25
```

 YOM
YAMAGUCHI
OBRIEN
MANGIO
COURT REPORTING & VIDEO

206.622.6875 | 800.831.6973
production@yomreporting.com
www.yomreporting.com

```
1           A P P E A R A N C E S   (Continuing)

2

3    FOR KENT WISHART:

4         CHRISTOPHER N. COYLE
          Vanden Bos & Chapman, LLP
5         319 SW Washington Street, Suite 520
          Portland, Oregon 97204
6         503.241.4869
          chris@vbcattorneys.com

7

8    FOR MARIE DURFLINGER:

9         BRYAN C. GRAFF
          Ryan Swanson & Cleveland, PLLC
10        1201 Third Avenue, Suite 3400
          Seattle, Washington 98101
11        206.654.2278
          graff@ryanlaw.com

12

13   ALSO PRESENT:

14        GARY MCLEAN, debtor

15

16

17

18

19

20

21

22

23

24

25
```



YOM
YAMAGUCHI
OBHIN
MANCID
COURT REPORTING & VIDEO

206.622.6875 | 800.831.6973
production@yomreporting.com
www.yomreporting.com

```
1    well?

2        A. I suspect he was, but I don't have certainty.

3        Q. If Mr. Nitz was involved as a professional

4    employed by the estate through your firm, did you have

5    any conversations with Mr. Nitz about the sale of

6    Graphic Sciences?

7        A. Yes.

8        Q. And did he tell you what he was doing in

9    relation to the sale?

10       A. In regards to the McLean estate, everything was

11   for sale, everything was available for refinance.

12   Mr. McLean had an ongoing $32,000-per-month obligation

13   to his ex-wife that we were striving to meet.  So, yes,

14   in regards to trying to sell everything, we had

15   conversations.

16       Q. What time period do you think you had your

17   initial conversations with Mr. Nitz regarding the

18   Graphic Sciences sale?

19       A. Probably August or so of 2011.

20       Q. Can you tell me the substance of those

21   discussions?

22       A. All I know is that he said there was a

23   potential for a sale of the asset.

24       Q. Did he tell you the parameters of the sale and

25   how much Mr. McLean could expect to receive?
```



YOM
YAMAGUCHI
CHIN
MANGIO
COURT REPORTING & VIDEO

206.622.6875 | 800.831.6973
production@yomreporting.com
www.yomreporting.com

EXHIBIT 14

```
1        A. No.

2        Q. Did he ever tell you that?

3        A. I'm sure, ultimately, I found out about the

4    parameters.  But at the time I first heard about the

5    prospect of a sale, it was given a very low probability

6    of success.

7        Q. And why is that?

8        A. Mr. McLean was a 50 percent owner.  So his 50

9    percent interest, once again, was not worth much unless

10   his partner agreed to participate.  There was, as I

11   understand, a default on their bank loan.  There was a

12   necessary renewal.  Mr. McLean was in Chapter 11.  His

13   partner was in prison, and so the prospects didn't look

14   good.

15       Q. Was it through Mr. Nitz that you first learned

16   of the possibility of a sale?

17       A. No.  I believe I learned about it through

18   Mr. Steen.

19       Q. Do you know how Mr. Steen learned about it?

20       A. No.

21       Q. So that would have been in August of 2011?

22       A. I believe so.

23       Q. At what point did you learn that the sale was

24   actually going to happen?

25       A. Probably the day of the closing.  Once again,
```


YOM
YAMAGUCHI
OBRIM
MANGIO
COURT REPORTING & VIDEO

206.622.6875 | 800.831.6973
production@yomreporting.com
www.yomreporting.com

1      Q. In document production leading up to the

2  lawsuit?

3      A. No.  It was done several years ago in response

4  to a motion for contempt and for discovery in the

5  underlying King County action.

6      Q. What form did the disclosure take?

7      A. The schedule of disbursements, the proceeds

8  received.  That was in about 2013.

9      Q. So a couple of years after the money was

10  received and disbursed?

11      A. Correct.

12              (Exhibit Number 14 was marked for

13              identification.)

14      Q. (BY MR. SMITH)  Exhibit 14 is a pleading that

15  was filed with the court on September 6, 2011.  It's

16  titled Debtor's Reply to Response of Kathleen McLean to

17  Debtor's Motion to Dismiss Chapter 11 Case for Cause.

18  Did you draft this?

19      A. No.

20      Q. Who did?

21      A. Jeff Smoot.

22      Q. Why was nothing mentioned in here regarding the

23  potential sale of the assets?  This is now in September

24  of 2011.

25      A. Correct.  I don't think that -- well, it



YOM
YAMAGUCHI
OBRIEN
IAA VIDEO
COURT REPORTING & VIDEO

206.622.6875 | 800.831.6973
production@yomreporting.com
www.yomreporting.com

EXHIBIT 14

1   appears that this was prior to the sale agreement being

2   signed.  So at that point in time, it continued to be a

3   potential for recovery, but it was not a certainty.

4        Q. Do you always wait, before you tell the Court,

5   until things are certainties?

6        A. Do I always wait to tell the Court until things

7   are certainties?

8        Q. Yeah.  If there's a sale in prospect that, if

9   it happens, will generate a significant sum of money,

10  why didn't you think -- at this point in time, in

11  September of 2011 -- that that was information that was

12  appropriately disclosed to the Court?

13       A. Because at this point in time, the asset had

14  been disclosed, the value had been disclosed.  Any

15  asset that Kathy McLean wanted to add to her collateral

16  bucket had been granted to her.  And so at this point

17  in time, it wasn't necessary to disclose it because the

18  deal had been negotiated.

19       Q. You don't think that it would have been of

20  interest to the Court to know that there was a sale in

21  prospect that would generate over $2 million to

22  Mr. McLean?

23       A. I'm not sure what would be of interest to the

24  Court.  What I was dealing with was the parties and

25  negotiating a resolution of this case.  And the parties

 YOM
YAMAGUCHI
OBIN
MANGIO
COURT REPORTING & VIDEO

206.622.6875 | 800.831.6973
production@yomreporting.com
www.yomreporting.com

EXHIBIT 14
Case 10-14407-MLB   Doc 453-14   Filed 06/24/16   Ent. 06/24/16 10:58:31   Pg. 7 of 10

```
 1    received full disclosure about everything, as far as

 2    the assets that existed.  And they went through the

 3    assets, and they picked what they wanted, were granted

 4    those items, and the case was closed down.

 5         Q. Mr. Hanchett, you have a motion pending with

 6    the Court for a dismissal of the case based upon the

 7    lack of ongoing assets by Mr. McLean.

 8         A. Based on the lack of ability to reorganize,

 9    correct.

10         Q. And a lack of assets.  After the IDC sale, you

11    say, in the pleadings, that was the big crown jewel of

12    this case.  It didn't generate any money.  That's a

13    problem.

14         A. Well, it did generate money.  It generated

15    $3.4 million to Kathy McLean and 50 to $60 million to

16    other creditors.

17         Q. But none for the debtor?

18         A. None for the debtor.

19         Q. So you have this motion pending where that's

20    your justification to the Court, who has to make the

21    decision as to why it should grant your relief.  Now,

22    given that, that you're asking the Court to grant

23    relief on that basis, you don't think it's germane that

24    2.2 million in cash is going to be coming in

25    potentially soon?
```

 YOM
YAMAGUCHI
OHN-N
MANOIO
COURT REPORTING & VIDEO

206.622.6875 | 800.831.6973
production@yomreporting.com
www.yomreporting.com

EXHIBIT 14

1        A. Once again, that was an unknown at this time.

2        Q. It wasn't unknown. You knew the sale was

3    pending, or out there.

4        A. The sale hadn't been signed.

5        Q. It hadn't been signed, but you knew it was

6    being negotiated.

7        A. Just like we were negotiating a sale of

8    Westmark. Just like we were negotiating a sale of MB

9    Partners. Everything was being negotiated for sale at

10   that point in time. None of these had a definitive

11   purchase and sale agreement associated with them. The

12   creditors all knew about the assets. They were

13   disclosed in the divorce and disclosed in the

14   bankruptcy. The fact that this one happened to hit

15   postdismissal was the way the draw worked out.

16       Q. Were you in discussions with anyone at

17   Vandeberg, at the time this pleading was filed, about

18   the sale -- the potential sale?

19       A. What I heard from Vandeberg is that the sale

20   was a possibility but not a likely prospect.

21                (Exhibit Number 15 was marked for

22                identification.)

23                MR. SMITH: Does anyone need to take a

24   short break before we go forward?

25                MR. MCLEAN: Yes.

 YOM
YAMASUCHI
ONHN
MASAOD
COURT REPORTING & VIDEO

206.622.6875 | 800.831.6973
production@yomreporting.com
www.yomreporting.com

1                        REPORTER'S CERTIFICATE

2

3        I, SHARI L. WHEELER, the undersigned Certified

4    Court Reporter, pursuant to RCW 5.28.010, authorized to

5    administer oaths and affirmations in and for the State

6    of Washington, do hereby certify that the testimony

7    and/or proceedings, a transcript of which is attached,

8    was given before me at the time and place stated

9    therein; that any and/or all witness(es) were duly

10   sworn to tell the truth; that the sworn testimony

11   and/or proceedings were by me stenographically recorded

12   and transcribed under my supervision, to the best of my

13   ability; that the foregoing transcript contains a full,

14   true, and accurate record of all the sworn testimony

15   and/or proceedings given and occurring at the time and

16   place stated in the transcript; that a review of which

17   was requested; that I am in no way related to any party

18   to the matter, nor to any counsel, nor do I have any

19   financial interest in the event of the cause.

20        WITNESS MY HAND AND SIGNATURE this 3rd day of

21   December, 2015.

22

23   _____
     SHARI L. WHEELER,
24   Washington State Certified Court Reporter, #2396
     swheeler@yomreporting.com

25

YOM                206.622.6875 | 800.831.6973
                   production@yomreporting.com
YAMAGUCHI         www.yomreporting.com
OBRIEN
MANGIO
COURT REPORTING & VIDEO

                          EXHIBIT 14